# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00364-CV

---

**Low Income Consumers, Mary Wilson and Hipolita Lutz, Appellants**

**v.**

**Public Utility Commission of Texas, Appellee**

---

### DIRECT APPEAL FROM THE PUBLIC UTILITY COMMISSION OF TEXAS
### RULEMAKING PROCEEDING NO. 47343

---

### M E M O R A N D U M   O P I N I O N

Mary Wilson and Hipolita Lutz, who refer to themselves as "Low Income Consumers," bring this direct appeal to challenge amendments to Rules 25.478 and 25.480 that the Public Utility Commission adopted in 2018. *See* 16 Tex. Admin. Code §§ 25.478 (Pub. Util. Comm'n, Credit Requirements and Deposits), 25.480 (Pub. Util. Comm'n, Bill Payment and Adjustments);[1] *see also* Tex. Util. Code § 39.001(e) (addressing judicial review of competitive rules adopted by Commission); 43 Tex. Reg. 3001 (May 2018). The Commission adopted the amended rules to address the expiration of the System Benefit Fund (SBF) pursuant to former section 39.903(m) of the Public Utility Regulatory Act (PURA). *See* former Tex. Util. Code § 39.903(m) (stating that section expired on September 1, 2017).

---

[1] References in this opinion to Title 16 of the Texas Administrative Code are to Commission rules.

Raising six issues, appellants contend that the Commission did not comply with rulemaking provisions of the Administrative Procedure Act (APA), *see* Tex. Gov't Code § 2001.033 (stating requirements for agency order that adopts rule), and they argue that the Commission misconstrued relevant statutes. The City of Houston intervened and has filed a brief in support of appellants that raises three issues similarly challenging the Commission's compliance with the APA and its construction of relevant statutes. The City also argues that the Commission exceeded its authority. Because we conclude that the Commission acted within its authority and complied with the APA, we affirm the Commission's order adopting the amended rules.

**Background**

The SBF was created in 1999 as a trust fund to assist low-income retail electric customers, and it expired by its own terms on September 1, 2017. *See* former Tex. Util. Code § 39.903(m); *see also id.* §§ 39.903(*l*) (defining "low-income electric customer" for purposes of section), 39.9039 (addressing elimination of SBF balance); 16 Tex. Admin. Code § 25.5(65) (Definitions) (defining "low-income customer").[2] The SBF was financed by a mandatory surcharge on electric utility usage. *See* former Tex. Util. Code § 39.903(b).

Citing the SBF's expiration as of September 1, 2017, the Commission published notice of its intent to adopt rules in December 2017 and stated that the purpose of the rulemaking

---

[2] Prior to the adoption of the amended rules in 2018, the Commission's definition of "low-income customer" was consistent with the statutory definition in former PURA section 39.903(*l*). A "low-income customer" was defined as "[a]n electric customer, whose household income is not more than 125% of the federal poverty guidelines, or who receives food stamps from the Texas Department of Human Services (TDHS) or medical assistance from a state agency administering a part of the medical assistance program." Former 16 Tex. Admin. Code § 25.5(65); *see former* Tex. Util. Code § 39.903(*l*).

was to repeal rules related to the SBF and to remove references to the SBF in other rules. *See* 42 Tex. Reg. 7495 (Dec. 2017). In response to its notice, the Commission received comments from Texas Ratepayers Organization to Save Energy (Texas ROSE), Texas Legal Services Center (TLSC), Texas Coalition for Affordable Power (TCAP), the Office of Public Utility Counsel (OPUC), Alliance of Retail Marketers (ARM), and Texas Energy Association for Marketers (TEAM).

In its order adopting the amended rules, the Commission repealed rules relating to the SBF and amended rules to remove references to the SBF and its corresponding rate reduction program, including amending former Rules 25.478 and 25.480. *See* 43 Tex. Reg. 3001, 3073– 74, 3077–79. In the order's opening paragraph, the Commission generally explained the basis for the rulemaking:

> The repeal of Subchapter Q reflects the cessation of the System Benefit Fund, as required by House Bill 1101, 84th Legislative Session (Regular Session), and the proposed amendments update language in order to remove references to the System Benefit Fund. In addition, Senate Bill 1976, 85th Legislative Session (Regular Session), provides means by which electric providers and certified telecommunications utilities can continue to offer assistance to low-income customers. The repeal of Subchapter Q and amendments in other subchapters to remove references to the System Benefit Fund effectuate House Bill 1101 and Senate Bill 1976 with respect to retail electric providers. The repeals, amendments and new section are adopted under Project Number 47343.

*Id.* at 3001; *see* Tex. Util. Code § 14.002 (authorizing Commission to adopt and enforce rules reasonably required in exercise of its powers and jurisdiction).

Among the rules repealed in the order, the Commission repealed former Rule 25.454, which implemented the rate reduction program for low-income customers utilizing the trust fund. *See* former 16 Tex. Admin. Code § 25.454 (Rate Reduction Program); *see also* former Tex. Util. Code § 39.903(h) (requiring Commission to adopt rules to determine reduced

3

rates for eligible customers). The "rate reduction program" was defined as "[a] program to provide reduced electric rates for eligible low-income customers, in accordance with the [PURA] § 39.903(h)." *See* former 16 Tex. Admin. Code § 25.5(101). The program required retail electric providers (REPs) to provide utility rate discounts to eligible low-income electric customers and to identify the discount amount with a line item on the customer's bill that included the description "LITE-UP Discount." *See id.* § 25.454(e)(3)(C). As part of this program, the REP generally received reimbursement from the SBF to cover the discount amount. *See* former Tex. Util. Code § 39.903(i) (addressing reimbursement from SBF). In its order, the Commission also amended the definition of "low-income customer," *see* former 16 Tex. Admin. Code § 25.5(65),[3] and explained that the SBF's expiration included the expiration of the mechanism by which the Commission identified low-income customers, *see generally* 43 Tex. Reg. 3001–3089.

At the center of the parties' dispute, former Rule 25.478(e)(3) required REPs to offer low-income customers who qualified for the rate reduction program in former Rule 25.454 ("qualified low-income customers") the option of paying credit deposits in two equal payments, *see* former 16 Tex. Admin. Code § 25.478(e)(3), and deferred payment plans, *see id.* § 25.480(j)(2)(A), and prohibited REPs from charging these same customers a late fee, *see id.* § 25.480(c). Specifically, former Rule 25.478(e)(3)(c) stated that "a customer or applicant [who] qualifies for the rate reduction program under § 25.454 of this title" was "eligible to pay any deposit that exceeds $50 in two equal installments"; former Rule 25.480(j)(2)(A) included

---

[3] The Commission's amended definition of a "low-income customer" is "[a]n electric customer who receives Supplemental Nutrition Assistance Program (SNAP) from Texas Health and Human Services Commission (HHSC) or medical assistance from a state agency administering a part of the medical assistance program." 16 Tex. Admin. Code § 25.5(65) (Definitions).

4

"customers receiving the LITE-UP discount pursuant to § 25.454 of this title" among the customers who were eligible for a deferred payment plan; and former Rule 25.480(c) included "customers receiving a low income discount pursuant to [PURA section] 39.903(h)" among the customers whom the REPs could not charge a late fee.

In its order, the Commission deleted subsection (e)(3) of former Rule 25.478, the split-deposit provision, in its entirety, and amended subsections (c) and (j)(2)(A) of former Rule 25.480 as follows:

(c)     Penalty on delinquent bills for electric service.

A REP may charge a one-time penalty not to exceed 5.0% on a delinquent bill for electric service.  No such penalty shall apply to residential or small commercial customers served by the provider of last resort (POLR)[, or to customers receiving a low income discount pursuant to the Public Utility Regulatory Act (PURA) § 39.003(h)].[4]  The one-time penalty, not to exceed 5.0%, may not be applied to any balance to which the penalty has already been applied.

…

(j)     Deferred payment plans and other alternate payment arrangements.

…

(2)     A REP shall make a payment plan available, upon request, to a residential customer that meets the requirements of subparagraph (A) of this paragraph for a bill that becomes due in July, August, or September.  A REP shall make a payment plan available, upon request, to a residential customer that meets the requirements of subparagraph (A) of this paragraph for a bill that becomes due in January or February if in the prior month a TDU notified the commission pursuant to § 25.483(j) of this title of an extreme weather emergency for the residential customer's county in the TDU service area for at least five consecutive days during the month.  A REP is not required to offer a payment plan to a customer pursuant to this paragraph if the customer is on an existing deferred, level, or average payment plan.

(A)     The following residential customers are eligible for a payment plan under this paragraph:

---

[4] "Provider of last resort" is referred to in the Commission's rules as "POLR" and is a REP that the Commission designates to provide a "basic, standard retail service package."  *See* 16 Tex. Admin. Code § 25.5(90).

[(i)     customers receiving the LITE-UP discount pursuant to § 25.454 of this title;]

(i)[ii] customers designated as Critical Care Residential Customers or Chronic Condition Residential Customers under § 25.497 of this title (relating to Critical Load Industrial Customers, Critical Load Public Safety Customers, Critical Care Residential Customers, and Chronic Condition Residential Customers); or

(ii)[iii] customers who have expressed an inability to pay unless the customer:
(I)      has been disconnected during the preceding 12 months;
(II)     has submitted more than two payments during the preceding 12 months that were found to have insufficient funds available; or
(III)    has received service from the REP for less than three months, and the customer lacks:
(a) sufficient credit; or
(b) a satisfactory history of payment for electric service from a previous REP or utility.

The deleted language from the former rule is identified by strikethrough.

After the Commission adopted the amended rules, Mary Wilson and Hipolita Lutz filed this direct appeal to challenge the repeal of subsection (e)(3) of former Rule 25.478 and the amendments to subsections (c) and (j)(2)(A) of former Rule 25.480. *See* Tex. Util. Code § 39.001(e) (stating that judicial review of validity of competitive rules adopted by Commission "shall be commenced in the Court of Appeals for the Third Court of Appeals District"). The City of Houston filed a motion for leave to file plea in intervention in support of appellants, which this Court granted.

**Analysis**

**Standards of Review**

Except as otherwise provided by PURA chapter 39, judicial review of competitive rules adopted by the Commission is conducted under the APA. *Id.* §§ 11.007(a), 39.001(e); *see* Tex. Gov't Code §§ 2001.21–.41 (addressing rulemaking). Under this standard,

6

we presume that an agency rule is valid, and the party challenging the rule has the burden of demonstrating its invalidity. *See McCarty v. Texas Parks & Wildlife Dep't*, 919 S.W.2d 853, 854 (Tex. App.—Austin 1996, no writ). "To establish a rule's facial invalidity, the challenger must show that the rule (1) contravenes specific statutory language, (2) is counter to the statute's general objectives, or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *Ware v. Texas Comm'n on Law Enforcement Officer Stds. & Educ.*, No. 03-12-00740-CV, 2013 Tex. App. LEXIS 5983, at *4–5 (Tex. App.—Austin May 16, 2013, no pet.) (mem. op.).

Our review includes whether the Commission "had statutory authority to promulgate the rule." *City of Alvin v. Public Util. Comm'n of Tex.*, 143 S.W.3d 872, 878 (Tex. App.—Austin 2004, no pet.). The Commission only has the authority that is expressly provided by statute or necessarily implied to carry out the express powers the legislature has given it. *See Public Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315–16 (Tex. 2001). Further, our review is limited to the Commission's rulemaking record, which consists of the proposed rule's notice; all comments of interested persons; the materials on which the Commission relied such as studies, reports, and memoranda; and the order adopting the rule. Tex. Util. Code § 39.001(e).

Appellants' and the City's issues also concern matters of statutory construction, which we review de novo. *See Texas Mun. Power Agency v. Public Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd

7

results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We consider the entire act, not isolated portions. *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008); *see Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (explaining that courts "generally avoid construing individual provisions of statute in isolation from the statute as a whole"). Further, we "generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Texas Citizens*, 336 S.W.3d at 625 (quoting *First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)).

Applying these standards, we turn to the issues that appellants and the City raise.

**Notice**

In appellants' first issue and as part of the City's second issue, appellants and the City challenge the Commission's published notice as to its proposed rule regarding the split-deposit provision in former Rule 25.478(e)(3). They argue that the notice "failed to place low-income consumers on notice that the then-existing protection of a Split Deposit was in jeopardy of deletion." In its published notice, the Commission proposed amending subsection (e)(3) of former Rule 25.478 to require REPs to offer the option of split deposits to all customers, *see* 42 Tex. Reg. 7495, 7506,[5] but Rule 25.478 as adopted removed subsection (e)(3) in its entirety.

---

[5] In the notice, the Commission proposed amending former Rule 25.478(e) as follows:

(e) Amount of deposit.

(1)-(2) (No change.)

8

The APA generally provides for public participation in a state agency's rulemaking process. *See* Tex. Gov't Code §§ 2001.001(2) (stating that public policy of state through chapter is to "provide for public participation in the rulemaking process"), .021 (addressing petitions for adoption of rules); *see also* Tex. Util. Code § 39.001(e). One requirement under the APA is that the state agency provide public notice of its intention to adopt a rule. *See* Tex. Gov't Code §§ 2001.023 (requiring state agency to give at least 30 days' notice of intent to adopt rule and to "file notice of the proposed rule with the secretary of state for publication in the Texas Register"), .024 (providing required content of notice of intent to adopt rule).

The relevant inquiry for determining whether an agency's notice satisfies the APA's notice requirement is "whether the agency's notice fairly apprises affected parties of the pertinent issues to allow them to comment and participate in the rulemaking process in a meaningful and informed manner." *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 650 (Tex. 2004); *see State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 800–01 (Tex. App.—Austin 1982, writ ref'd n.r.e.). Under this inquiry, the adopted rule satisfies the APA if it "is a logical outgrowth of the proposed rule" such that "the final rule does not

---

(3)  A [If a customer or applicant qualifies for the rate reduction program under § 25.454 of this title (relating to Rate Reduction Program), then such] customer or applicant shall be eligible to pay any deposit that exceeds $50 in two equal installments. Notice of this option [for customers eligible for the rate reduction program] shall be included in any written notice to a customer from whom [requesting] a deposit is requested. [The customer shall have the obligation of providing sufficient information to the REP to demonstrate that the customer is eligible for the rate reduction program.]  The first installment shall be due no sooner than ten days, and the second installment no sooner than 40 days, after the issuance of written notification to the applicant of the deposit requirement.

The language that was deleted from the former rule is identified by strikethrough and the language that was added is underlined.

materially alter the issues raised in the proposed rule." *Patient Advocates*, 136 S.W.3d at 650.

"This approach supports the rationale of the notice and comment requirement which is 'the expectation that the final rules will be somewhat different and improved from the rules originally proposed by the agency.'" *Id.* (quoting *Trans-Pacific Freight Conf. v. Federal Mar. Comm'n*, 650 F.2d 1235, 1249 (D.C. Cir. 1980)).

The Commission's published notice included the following statements as to the purpose of its rulemaking:

> The Public Utility Commission of Texas (commission) proposes to repeal 16 Texas Administrative Code (TAC) Chapter 25, Subchapter Q (Subchapter Q), relating to System Benefit Fund, including 16 TAC § 25.451, relating to Administrative of the System Benefit Account; § 25.453, relating to Targeted Energy Efficiency Programs; § 25.454, Rate Reduction Program; § 25.455, One-Time Bill Payment Assistance Program; and § 25.457, relating to Implementation of the System Benefit Fee by the Municipally Owned Utilities and Electric Cooperatives; amend 16 TAC § 25.5, relating to Definitions; § 25.41, relating to Price to Beat Rule; § 25.43, relating to Provider of Last Resort (POLR); § 25.107, relating to Certification of Retail Electric Providers (REPs); § 25.181, relating to Energy Efficiency Goal; § 25.344, relating to Cost Separation Proceedings; § 25.431, relating to Retail Competition Pilot Project; § 25.475, relating to General Retail Electric Provider Requirements and Informal Disclosures to Residential and Small Commercial Customers; § 25.478, relating to Credit Requirements and Deposits; § 25.479, relating to Issuance and Format of Bills; § 25.480, relating to Bill Payment and Adjustments; § 25.491, relating to Record Retention and Reporting Requirements; § 25.497, relating to Critical Load Industrial Customers, Critical Load Public Safety Customers, Critical Care Residential Customers, and Chronic Condition Residential Customers; and § 25.498, relating to Prepaid Service; and add new § 25.45, relating to Low-Income List Administrator. The repeal of Subchapter Q reflects the cessation of the System Benefit Fund, as required by House Bill 1101, 84th Legislative Session (Regular Session), and the proposed amendments update language in order to remove references to the System Benefit Fund. The proposed new 16 TAC § 25.45, relating to the Low-Income List Administrator, identifies the revised responsibilities associated with the Low-Income List Administrator. In addition, Senate Bill 1976, 85th Legislative Session (Regular Session), provides means by which electric providers and certified telecommunications utilities can continue to offer assistance to low-income customers. The repeal of Subchapter Q and amendments in other subchapters to

remove references to the System Benefit Fund effectuate House Bill 1101 and Senate Bill 1976 with respect to retail electric providers.

42 Tex. Reg. 7495. The Commission's notice makes clear that the purpose of the rulemaking was to repeal rules related to the SBF—including former Rule 25.454, the rate reduction program—and amend other rules to "update language in order to remove references to the System Benefit Fund."

Because the statutory authority for the SBF expired on September 1, 2017, and the Commission's notice in December 2017 proposed repealing former Rule 25.454, the rate reduction program, the qualified low-income customers were on notice that, under the Commission's proposed rules, they no longer would be entitled to split their deposits based on their previous enrollment in the rate reduction program. In this context, with the publication of the proposed rule to require REPs to offer a split-deposit option to all customers, the qualified low-income customers were necessarily on notice that they—along with all other customers— might or might not be entitled to the split-deposit option going forward.[6]

We conclude that the adopted rule did not materially alter the issues raised in the proposed rule but was a "logical outgrowth" of the proposed rule. *See Patient Advocates*, 136 S.W.3d at 650. The notice fairly apprised the qualified low-income customers "of the pertinent issues to allow them to participate in the rulemaking process in a meaningful and informed matter"—they were on notice of the need to advocate during the rulemaking process for an alternative way to identify low-income customers and a corresponding provision that

---

[6] Appellants and the City refer to the "status quo" as the existence of the split-deposit provision for low-income customers but, once the Commission repealed the rate reduction program, no customer would be able to meet the requirements of the former provision because a customer's eligibility was determined based on his or her qualification to participate in the rate reduction program. *See* former 16 Tex. Admin. Code § 25.478(e)(3).

11

required REPs to offer the option of split-deposits to this newly created category of low-income customers in the event that the Commission decided not to amend the rule as proposed. *Id.* Thus, we conclude that the Commission satisfied the APA's notice requirements as to the split-deposit provision in former Rule 25.478(e)(3). We overrule appellants' first issue and the City's second issue to the extent that it challenged the Commission's notice.

**Reasoned Justification**

In appellants' second, third, and fourth issues and the City's second issue, appellants and the City contend that the Commission's stated justifications for Rules 25.478(e) and 25.480(c) and (j)(2)(A)(i) as adopted did not conform with the reasoned-justification requirement of section 2001.033(a)(1) of the APA. *See* Tex. Gov't Code § 2001.033(a)(1). In their sixth issue, appellants further argue that the Commission provided no explanation for disagreeing with proposals to expand the provisions to all residential customers. *See id.* § 2001.033(a)(1)(C). In its second issue, the City also challenges the Commission's responses to comments that it received during the rulemaking process.

In addition to the notice requirement, an agency must provide an opportunity for and full consideration of comments and a "reasoned justification" for the rule. *See id*. §§ 2001.029 (requiring agency to give interested persons "reasonable opportunity to submit data, views, or arguments, orally or in writing"), .033; *Lambright v. Texas Parks & Wildlife Dep't*, 157 S.W.3d 499, 504–05 (Tex. App.—Austin 2005, no pet.). To satisfy the "reasoned justification" requirement, the agency must explain in the order adopting the rule the "how and why" it reached its conclusions. *Lambright*, 157 S.W.3d at 504. We confine our search for a "reasoned justification to the four corners of the order finally adopting the rule, and the agency

must provide a reasoned justification for the rule as a whole, not clause by clause." *Id.* (citing *Reliant Energy, Inc. v. Public Util. Comm'n of Tex.*, 62 S.W.3d 833, 840 (Tex. App.—Austin 2001, no pet.)). The agency's reasoned justification must include (1) a summary of interested persons' comments; (2) a summary of the rule's factual basis; and (3) the reasons why the agency disagreed with a party's comments. *See id.* (citing Tex. Gov't Code § 2001.033). "An order demonstrating 'in a relatively clear and logical fashion that the rule is a reasonable means to a logical objective' substantially complies with the reasoned justification requirement." *Id.* (quoting Tex. Gov't Code § 2001.035(c)). "The order must accomplish the legislative objectives underlying the reasoned justification requirement: to give notice of factual, policy, and legal bases for the rule as adopted by the agency, in light of all the evidence it gathered." *Id.* at 504–05 (citing *Reliant Energy, Inc.*, 62 S.W.3d at 841).

Our review of a challenge to the reasoned justification requirement is under an "arbitrary and capricious" standard of review in which we do not presume that facts exist to support the agency's order. *Id.* at 505 (citing *Reliant Energy*, 62 S.W.3d at 841). Under this standard, "we examine whether the agency's explanation of the facts and policy concerns it relied on in adopting the rule demonstrates that the agency considered all relevant factors and engaged in reasoned decisionmaking." *Id.* "An agency acts arbitrarily if in making a decision it: (1) omits from its consideration a factor that the legislature intended the agency to consider in the circumstances; (2) includes in its consideration an irrelevant factor; or (3) reaches a completely unreasonable result after weighing only relevant factors." *Id.*

In the order adopting the rules, the Commission documented interested persons' arguments during the comment period for and against making the split-deposit, late-fee-waiver, and deferred-payment-plan provisions in the former rules applicable to all customers going

13

forward,[7] and explained its reasons for declining to adopt rules that would have mandated that REPs offer those provisions to all customers.

As to interested persons' proposals that the late-fee-waiver and deferred-payment-plan provisions be made available to all customers, the Commission explained that it declined to adopt those proposals because "the proposal[s are] beyond the scope of this rulemaking." Appellants challenge this explanation, including arguing that the Commission failed to provide any justification for: (i) "taking from low-income consumers the protection of the Late Penalty Waiver provided by former Substantive Rule 25.480(c), while retaining it for residential and small commercial customers served by a [POLR]," *see* 16 Tex. Admin. Code § 25.480(c); and (ii) "why it continued to allow critical care customers the protections of Deferred Payment Plans, but not low-income customers," *see id.* § 25.480(j)(2)(A). The stated purpose of the rulemaking, however, was to repeal rules related to the SBF and to remove references to the SBF in other rules. After the SBF and its related programs no longer existed, there were no qualified low-income customers who fell within the category of customers identified under former Rule

---

[7] For example, after documenting Texas ROSE's and TLSC's proposals to expand the provisions that were formally reserved for low-income customers to all residential customers, the Commission stated ARM's reply as follows:

> ARM argued that there is no rational justification for these proposals, other than to effectively reinstate expired low-income programs and benefits by simply expanding them to apply to all residential customers. ARM asserted that, if the commission were to adopt such proposals, it would chart a radical new direction for the competitive retail market by imposing new regulatory requirements on REPs that would significantly modify current operations, without any reasonable justification. ARM asserted that the commission should look to the competitive market rather than enact new regulatory mandates that expansively reinstate expired mandates that were formerly applicable only to a subset of residential customers.

25.480(c) and (j)(2)(A). Appellants have not cited, and we have not found, authority that would require the Commission in its rulemaking to adopt rules that are beyond the scope of its stated reasons for the rulemaking.

As to the split-deposit provision, although the Commission initially proposed adopting a rule that would have required REPs to offer the option of splitting deposits to all customers, the Commission detailed the comments that it received and then explained its reasons for declining to adopt that provision:

> The Commission agrees with ARM that the split deposit provision would be inconsistent with PURA §17.007(c). While it is unclear the amount of the costs to the REPs as a result of the commission adopting the proposed rule to split the deposit for all customers, it is clear that there would be costs that would not be reimbursed, which would be contrary to the new provision in SB 1976. Therefore, the commission removes the requirement for REPs to provide a two month deposit option to all customers.

*See* Tex. Util. Code § 17.007(c). After September 1, 2017, section 17.007(c) expressly prohibits the Commission from requiring a REP or certificated telecommunications utility "to offer customer service, discounts, bill payment assistance, targeted bill messaging, or other benefits for which the provider or utility is not reimbursed." *Id.*

We consider section 17.007(c) in context. *See Texas Citizens*, 336 S.W.3d at 628; *Scott,* 309 S.W.3d at 930. Prior to September 1, 2017, and pursuant to its authority under former section 17.007, the Commission's rules provided an automatic process to identify low-income customers for purposes of determining their eligibility to participate in SBF programs. *See* former Tex. Util. Code § 17.007 ("The commission by rule shall provide for an integrated eligibility process for customer service discounts, including discounts under Sections 39.903 and 55.015."); former 16 Tex. Admin. Code §§ 25.5(66) (defining "Low Income Discount

15

Administrator" to mean "[a] third party administrator contracted by the commission to administer aspects of the rate reduction program under [PURA] § 39.903"), 25.451 (Administration of the System Benefit Fund), 25.454 (describing rate reduction program). In contrast, section 17.007 as amended provides a voluntary identification process for the Commission and the Health and Human Services Commission to identify low-income customers to "enable" REPs "to offer customer service, discounts, bill payment assistance, or other methods of assistance." *See* Tex. Util. Code § 17.007(a), (b). The generation of a list of low-income customers is no longer mandatory—the list is generated only if a REP requests and agrees to reimburse the Commission for the cost. *Id.* § 17.007(d); *see also* 16 Tex. Admin. Code § 25.45(c) (Low-Income List Administrator) (explaining low-income customer identification process), (d) (explaining responsibilities of administrator and participating REPs). Given the statutory and regulatory changes from an automatic list and mandated programs to a voluntary approach, the Commission reasonably cited section 17.007(c) among its authority supporting its amended rule as to the split-deposit provision. *See McCarty*, 919 S.W.2d at 854 (explaining that agency rule is reasonable when it is based on "some legitimate position by the agency" and that "[t]he rule need not be wise, desirable, or even necessary").

We also observe that the Commission documented the interested persons' competing positions as to the split-deposit provision. The Commission documented the position of ARM and TEAM, who opposed amending the rule to require REPs to offer all customers the option of splitting deposits, as follows:

> TEAM argued that the proposed rule is inconsistent with PURA § 17.008(h), which TEAM asserted recognizes a REP's authority to require a deposit as a condition of receiving service, and also with § 25.478(c), which provides that, if satisfactory credit cannot be demonstrated by a residential applicant, a REP may

16

require the applicant to pay a deposit prior to receiving service. Similarly, ARM asserted the proposed rule is inconsistent with PURA § 17.007(c), which provides that the commission may not require a REP to offer customer service, discounts, bill payment assistance, targeted bill messaging, or other benefits for which the REP is not reimbursed. ARM asserted that the bill's sponsor acknowledged that the bill prohibits the commission from requiring a REP to take on unreimbursed costs created by special rule. ARM argued that the commission should support competitive solutions over regulatory mandates, citing 15 years of market maturity after the introduction of customer choice. ARM stated that an emphasis on competitive outcomes is consistent with the overarching legislative policies and purposes applicable to the state's restructured electric industry as enshrined in PURA § 39.001. ARM argued that the shift from unfunded to voluntary low-income programs and benefits will increase the incentive for REPs to differentiate themselves in the market by offering such programs and benefits that they might not otherwise offer.

*See* Tex. Util. Code § 17.008(h) (stating that section 17.008, which addresses protections of residential electric service applicants and customers, "does not limit a retail electric provider's authority to require a deposit or advance payment as a condition of service"); 16 Tex. Admin. Code § 25.478(c)(1) (authorizing REP to require applicant to pay deposit prior to receiving service).

The Commission also documented ARM's stated concerns about the financial exposure to a REP "until the customer has paid the deposit in full" and the costs and risks associated with mandating that REPs offer all customers the option to split their deposits:

ARM asserted that allowing the provider to collect a security deposit from customers who present a credit risk in advance of providing several weeks' worth of electric service on credit is a well-established business practice in both regulated and competitive retail markets, as codified in § 25.24, which establishes deposit requirements applicable to electric utilities in the regulated retail electric market and § 25.478, which establishes deposit requirements applicable to REPs in the competitive retail electric market. ARM and TEAM argued that the split deposit provision for all residential customers is without precedent in the Texas electric industry, noting that it was not required of the vertically integrated electric utilities prior to the restructuring of the market, and there is no similar provision in the commission's rules or statutes for the investor-owned utilities outside of ERCOT, electric cooperatives, or municipality owned utilities. ARM

17

and TEAM agreed that requiring a split deposit provision would fundamentally change the regulatory construct under which REPs have designed post-paid products. ARM stated that it was not aware of any split deposit provision in any other industry, and urged the commission to reaffirm its prior decisions in Project Nos. 27084 and 31417 concluding that requiring a REP to offer installment payments on security deposits to all residential customers would "negate the protection against non-payment that a deposit provides for a REP."

. . .

Utilizing ERCOT switching data and its timeline from flowing power to disconnection, ARM estimated the total potential cost of extending the split deposit provision to all residential customers to be in the range of $28.6 million to $158.8 million based on bad debt exposure alone, not including the costs of IT project expenditures, personnel training, documentation revising, and other implementation costs that the REPs would incur. TEAM noted that the provision would increase the cost of manual processes through increased operational costs, as the REP would need to process each of the split deposits through one-on-one contact with the customer, which would add cost and take away resources from addressing customer needs. TEAM asserted that these costs will not be recovered from some customers who switch away after disconnection. ARM asserted that, on the low end, if the REP were to delay initiating service until the rest of the deposit was received, such costs could be $15.5 million to $90.8 million. ARM stated that, even assuming a conservative scenario in which REPs tighten credit and collection processes, increase deposit amounts, expand deposit assessment rates, or shorten disconnection timelines, the impacts would still be in the range of $11.4 million to $63.5 million per year.

The Commission further documented ARM's reliance on the Commission's stated reasons in prior rulemaking for rejecting proposals for mandating a split-deposit provision for all customers. ARM asserted that the Commission's prior reasoning included that "such a proposal would negate the protection against non-payment that a deposit provides for a REP" and that "such a market-wide requirement would place 'too great a financial risk on REPs and is not sufficiently tailored to serving low-income customers' needs, especially when alternatives exist that are more tailored." Finally, the Commission detailed other interested persons' counter-arguments and disagreements with ARM's estimated cost numbers.

Based on our review of the Commission's rulemaking record, we conclude that the Commission substantially complied with the reasoned-justification requirement as to its adopted rules. *See* Tex. Gov't Code § 2001.035(c); Tex. Util. Code § 39.001(e). Based on the Commission's "explanation of the facts and policy concerns it relied on in adopting the rule," we conclude that it explained the "how and why" as to its decisions not to adopt the proposed provisions for all customers, that it adequately responded to comments, and that it engaged in reasoned decisionmaking. *See Lambright*, 157 S.W.3d at 504–05. We overrule appellants' second, third, fourth, and sixth issues and the City's second issue.

**Customer Protections**

Appellants' fifth issue and the City's first and third issues challenge the Commission's interpretations of statutory provisions in PURA chapters 17 and 39 and former section 39.903. Appellants characterize the split-deposit, deferred-payment-plan, and late-fee-waiver provisions as customer protections that are distinct from "benefits" that were subject to reimbursement under former section 39.903 and covered by section 17.007(c). *See* Tex. Util. Code §§ 17.001–.206 (addressing customer protections), 39.901 (addressing customer safeguards); former Tex. Util. Code § 39.903(h), (i). Appellants argue that the Commission misconstrued H.B. 1101, *see* 84th Leg., R.S., ch. 706, § 1, that was codified at PURA section 39.903, and S.B. 1976, that was codified at PURA section 17.007, *see* 85th Leg., R.S., ch. 48, § 1 (eff. Sept. 1, 2017).

Appellants further argue that the Commission failed to reconcile the split-deposit, deferred-payment-plan, and late-fee-waiver provisions with consumer protection provisions that the legislature did not amend, specifically PURA sections 17.001(b), 17.004(a)(2) and (b), and

19

39.101(b)(2) and (e). *See* Tex. Util. Code §§ 17.001(b) (providing that chapter's purposes include to establish retail customer protection standards), 17.004(a)(2), (b) (addressing customer protection standards, including as to customer's choice of service provider, and Commission's authority to adopt rules "to carry out this section, including rules for minimum service standards"), 39.101(b)(2), (e) (addressing "customer safeguards," including as to customer's choice of retail electric provider and Commission's authority to adopt rules to carry out its subsections "including rules for minimum service standards for a retail electric provider relating to customer deposits and the extension of credit"). Appellants argue that these PURA sections "expressly note the importance of minimum service standards to protect consumers in a competitive electricity market separate from the benefits previously provided by PURA § 39.903" and that the Commission omitted consideration of these standards in this rulemaking proceeding. Appellants contend that the Commission conflated "customer protections"—that reflect minimum service standards—with "benefits" and that the split-deposit, deferred-payment-plan, and late-fee-waiver provisions "represent minimum service standards" promulgated under sections 17.004 and 39.101 and "not benefits" of the SBF rate reduction program.

Appellants also rely on PURA's general provisions that reflect the need for minimum service standards, given "[s]ignificant changes" in the telecommunications and electric power industries since PURA was originally adopted, and PURA's purposes that include granting the Commission "authority to make and enforce rules necessary to protect customers of telecommunications and electric services consistent with the public interest." *See id.* § 11.002(c). "Changes in technology and market structure have increased the need for minimum

standards of service quality, customer service, and fair business practices to ensure high-quality service to customers and a healthy marketplace where competition is permitted by law." *Id.*

Similarly, in its first and third issues, the City argues that the Commission did not have authority to alter the provisions at issue—which it asserts were "customer protections" and not "benefits"—and that the Commission exceeded the authority provided by PURA section 17.007. *See City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d at 316 (explaining that Commission "is a creature of the legislature and has no inherent authority" (citation omitted)). The City relies on dictionary definitions of "benefit" and "protection" and their respective meanings in the context of PURA to support its position. *See Black's Law Dictionary* 178, 1343 (9th ed. 2009) (defining "benefit" to mean "[a]dvantage, privilege" and "protection" to mean "act of protecting"); *Webster's Third New International Dictionary* 1822 (2002) (defining "protect" to mean "to cover or shield from that which would injure, destroy, or detrimentally affect"). The City and appellants also argue that the amended rules are inconsistent with previous orders adopting rules in which the Commission recognized the necessity of customer protections, including for low-income customers. *See, e.g.*, 31 Tex. Reg. 2144 (2006) (adopting amendments to rules relating to low-income customers and discussing split-deposit provision); 29 Tex. Reg. 4847 (2004) (adopting customer protection rules in Subchapter R); 26 Tex. Reg. 125 (2000) (same).

As support for their positions, appellants and the City focus on the lack of reimbursement from the SBF for out-of-pocket expenses under the split-deposit, deferred-payment-plan, and late-fee-waiver provisions, *see* former Tex. Util. Code § 39.903; the Commission's placement of its substantive rules relating to the SBF in former Subchapter Q of its rules; and its placement of the split-deposit, deferred-payment-plan, and late-fee-waiver

21

provisions in Subchapter R, which addresses customer protection rules for retail electric service. *See* 16 Tex. Admin. Code § 25.471(a)(3) (General Provisions of Customer Protection Rules) ("The rules in this subchapter [R] are minimum, mandatory requirements that shall be offered to or complied with for all customers unless otherwise specified."), (b) (addressing purposes of subchapter including to "provide minimum standards for customer protections").

The Commission, however, was following the legislative directive in former PURA section 39.903(m) in this rulemaking proceeding when it removed references in the Commission's rules to the expired SBF and the corresponding rate reduction program. *See* former Tex. Util. Code § 39.903(m); former 16 Tex. Admin. Code § 25.5(101) (defining "rate reduction program" to mean "program to provide reduced electric rates for eligible low income customers, in accordance with [PURA] § 39.903(h)"). Following the legislative directive, the Commission's rulemaking implemented the repeal of rules relating to the SBF and its corresponding programs and amended or removed terms whose definitions referenced PURA section 39.903.

As to appellants' and the City's reliance on PURA sections 17.001(b), 17.004(a) and (b), and 39.101(e) to support their position that the split-deposit, late-fee-waiver, or deferred-payment-plan provisions are mandated protections, these statutes do not require REPs to offer these specific options. Section 17.001(b) provides the chapter's purpose and confers authority on the Commission "to adopt and enforce rules to protect retail customers from fraudulent, unfair, misleading, deceptive, or anticompetitive practices." *See* Tex. Util. Code § 17.001(b). Section 17.004(a) lists a series of entitlements available to all retail customers, but

22

it does not reference split deposits, late-fee waivers, or deferred payment plans. *Id.* § 17.004(a).[8]

Similarly, section 17.004(b) and section 39.101(e) expressly grant the Commission discretion to

---

[8] The entitlements for buyers of electric retail services that are listed in section 17.004(a) include:

(1) protection from fraudulent, unfair, misleading, deceptive, or anticompetitive practices, including protection from being billed for services that were not authorized or provided;

(2) choice of a telecommunications service provider, a retail electric provider, or an electric utility, where that choice is permitted by law, and to have that choice honored;

(3) information in English and Spanish and any other language as the commission deems necessary concerning rates, key terms and conditions, and the basis for any claim of environmental benefits of certain production facilities;

(4) protection from discrimination on the basis of race, color, sex, nationality, religion, marital status, income level, or source of income and from unreasonable discrimination on the basis of geographic location;

(5) impartial and prompt resolution of disputes with a certificated telecommunications utility, a retail electric provider, or an electric utility and disputes with a telecommunications service provider related to unauthorized charges and switching of service;

(6) privacy of customer consumption and credit information;

(7) accuracy of metering and billing;

(8) bills presented in a clear, readable format and easy-to-understand language that uses defined terms as required by commission rules adopted under Section 17.003;

(9) information in English and Spanish and any other language as the commission deems necessary concerning low-income assistance programs and deferred payment plans;

(10) all consumer protections and disclosures established by the Fair Credit Reporting Act (15 U.S.C. Section 1681 et seq.) and the Truth in Lending Act (15 U.S.C. Section 1601 et seq.); and

adopt and enforce rules related to customer protections and minimum service standards, but they do not require the Commission to maintain or expand the split-deposit, late-fee-waiver, or deferred-payment-plan provisions. *See id.* §§ 17.004(b), 39.101(e); *see also* Tex. Gov't Code 311.016(1) ("'May' creates discretionary authority or grants permission or a power.").

Inconsistent with the legislative directives in former section 39.903 and section 17.007, including the statutory change away from a mandated list of low-income customers, appellants' and the City's position would require this Court to conclude that the Commission was obligated to adopt rules to create a mandatory mechanism for determining a category of low-income customers to whom REPs would be required to offer the options of split deposits, deferred-payment plans, and late-fee-waivers going forward. In the context of this rulemaking proceeding, we cannot reach this conclusion. *See McCarty*, 919 S.W.2d at 854 (presuming that rule is valid and placing burden on party who is challenging rule); *see also Ware*, 2013 Tex. App. LEXIS 5983, at *4–5 (requiring challenger to show that rule contravenes specific statutory language, is counter to statute's general objectives, or imposes additional burdens, conditions, or restrictions in excess of or inconsistent with relevant statutory provisions). We overrule appellants' fifth issue and the City's first and third issues.

---

(11) after retail competition begins as authorized by the legislature, programs provided by retail electric providers that offer eligible low-income customers energy efficiency programs, an affordable rate package, and bill payment assistance programs designed to reduce uncollectible accounts.

Tex. Util. Code § 17.004(a). The statute references programs for low-income customers in subsection (11), but it does not dictate the specifics of the programs.

24

## Conclusion

Having overruled appellants' and the City's issues, we affirm the Commission's order adopting the amended rules.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Triana
  Concurring and Dissenting Opinion by Justice Triana

Affirmed

Filed:   April 30, 2020